FILED BY_____ER_____D.C.

**Dec 1, 2023**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 23-MJ-4368-TORRES

IN RE COMPLAINT

_____/

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)?    No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: _____
Jonathan D. Stratton
Assistant United States Attorney
FL Bar No. 93075
99 Northeast Fourth Street
Miami, Florida 33132-2111
Tel: 305-961-9151
Email: jonathan.stratton@usdoj.gov

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | Case No. 23-MJ-4368-TORRES |
| v. | ) | |
| | ) | |
| Victor Manuel Rocha, | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant._ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___November 1981 to December 1, 2023___ in the county of ___Miami-Dade___ in the

___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Act as An Agent of a Foreign Government and to Defraud the United States |
| 18 U.S.C. § 951 | Acting as an Illegal Agent of a Foreign Government |
| 18 U.S.C. § 1542 | Use of a Passport Obtained by a False Statement |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_Complainant's signature_

Michael J. Haley, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: ___12/01/2023___

_Judge's signature_

City and state: ___Miami, Florida___

Honorable Edwin G. Torres, Chief United States Magistrate Judge
_Printed name and title_

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

Case No. 23-MJ-4368-TORRES

v.

VICTOR MANUEL ROCHA,

Defendant.
_____/

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Michael Haley, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to a national security squad in the Miami Division.  I have been an FBI Special Agent since August 2020, and have been assigned to the Miami Division since January 2021.  My duties involve the investigation of a variety of federal offenses, including espionage and other counterintelligence matters relating to Cuba.  As a result, I am familiar with the methods of foreign agents acting in the United States at the direction or control of foreign governments, including efforts to conceal the transmission of nonpublic information by persons who possess, or have possessed, a U.S. government security clearance.  I am also familiar with the tradecraft used by Cuban intelligence officers.  Finally, I have received training on U.S. classified information and the system used by federal agencies to protect this information, including the rules and regulations that govern its storage, use, and lawful transmission.

2.    As a federal agent, I am authorized to investigate violations of U.S. laws and execute warrants issued under the authority of the United States.

3.    I make this affidavit in support of a criminal complaint for **VICTOR MANUEL**

ROCHA (the "Defendant") for violations of 18 U.S.C § 951 (acting as an agent of a foreign government), § 371 (conspiracy to commit an offense against the United States, specifically 18 U.S.C § 951), and § 1542 (use of a United States passport secured by false statement).

4.     The facts and information contained in this affidavit are based on my personal knowledge of the investigation, my training and experience, the observations and reports of other law enforcement officers, and information obtained from other agents and witnesses.   This affidavit is intended to show only there is sufficient probable cause for the requested complaint and does not set forth all my knowledge or all facts known to the United States about this investigation.

## THE CRIMINAL CONDUCT

### The Defendant

5.     The Defendant, **VICTOR MANUEL ROCHA**, was born in Colombia on or about October 23, 1950.  **ROCHA** became a naturalized United States citizen in 1978, and currently resides in Miami, Florida.  **ROCHA** possesses multiple United States passports as well as a passport from the Dominican Republic.

6.     As discussed below, by his own admission, beginning no later than approximately 1981, and continuing to the present, **ROCHA** secretly supported the Republic of Cuba and its clandestine intelligence-gathering mission against the United States by serving as a covert agent of Cuba's intelligence services.

7.     To further that role, **ROCHA** obtained and maintained employment in the United States government in positions that provided him: (1) access to nonpublic information, including classified information; and (2) the ability to affect United States foreign policy.  After his

2

employment ended, **ROCHA** held other positions and engaged in other acts intended to support Cuba's intelligence services. **ROCHA** always kept his status as a Cuban agent secret in order to protect himself and others and to allow himself the opportunity to engage in additional clandestine activity. For example, **ROCHA**: (1) provided false and misleading information to the United States to maintain his secret mission; (2) traveled outside the United States to meet with Cuban intelligence operatives; and (3) made false and misleading statements to obtain travel documents.

8.    At no time did **ROCHA** provide notification to the United States Attorney General or the Secretary of State as required by law that he was, in fact, acting as an agent of a foreign government, specifically the Republic of Cuba.

## The Republic of Cuba and its Intelligence Services

9.    The Republic of Cuba is an authoritarian, Communist state.

10.    From in or around 1961 until July 2015, the United States did not maintain diplomatic relations with the government of the Republic of Cuba. From in or around 1977 until July 2015, the United States Interests Section of the Swiss Embassy in Havana, Cuba, was designated as the official representative of the United States government to Cuba.

11.    Between 1982 and 2015, and from 2021 until the present, the United States Department of State has designated Cuba as a state sponsor of international terrorism in its State Sponsors of Terrorism List, due to Cuba's support for international terrorism and subversion of United States justice.

12.    Since the Cuban Revolution, members and associates of Cuba's Communist Party, including Cuba's intelligence services, used the Spanish term "Comandante" to refer to

3

Cuba's former leader Fidel Castro, and the term "Compañero," which means comrade in English, to refer to fellow regime loyalists.

13.   Starting with Fidel Castro's ascent to power, the Republic of Cuba viewed the United States as its primary threat, and Cuban government officials referred to the United States as an enemy of Cuba.

14.   Cuba's intelligence services include numerous intelligence and counterintelligence entities, including the Directorate of Intelligence, also known as the General Directorate of Intelligence, or in Spanish, "Dirección de Inteligencia" or "Dirección General de Inteligencia" (collectively, the "DGI"). The DGI is charged with gathering worldwide intelligence information of interest to Cuba and its allies.

15.   Members and associates of Cuba's intelligence services use the Spanish term "Dirección" to refer to the DGI.

16.   The United States was, and continues to be, the principal target for Cuba's intelligence gathering.  To that end, the DGI spots and assesses persons within the United States, including employees of the United States government, who may be suitable for recruitment to serve a variety of roles on behalf of Cuba's interests.

17.   One of the most important of these roles is that of agent – that is, a person who is not an officially-recognized employee of the DGI but who is aware he or she is working for the service and is willing to engage in clandestine operational activity, including intelligence gathering, at the direction, and on behalf, of the DGI.

## The Defendant's Positions at the Department of State

18.   Between in or around November 1981 and August 2002, **ROCHA** was employed by the United States Department of State ("DoS"), a department of the United States government that manages the United States' relationships with foreign governments and implements U.S. foreign policy.

19.   From in or around December 1982 until in or around January 1985, as a DoS employee, **ROCHA** served as a Political Officer at the United States Embassy in Santo Domingo, Dominican Republic.

20.   From in or around February 1987 until in or around February 1989, as a DoS employee, **ROCHA** served as a Political-Military Affairs Officer at the United States Embassy in Tegucigalpa, Honduras.

21.   From in or around February 1989 until in or around November 1991, as a DoS employee, **ROCHA** served as the First Secretary at the United States Embassy in Mexico City, Mexico.

22.   From in or around November 1991 until in or around July 1994, as a DoS employee, **ROCHA** served as the Deputy Chief of Mission at the United States Embassy in Santo Domingo, Dominican Republic.

23.   From in or around July 1994 until in or around July 1995, as a DoS employee, **ROCHA** served as the Director of Inter-American Affairs on the United States National Security Council, with special responsibility for, among other things, Cuba.  The following is a photograph of the defendant from that time:



24.   From in or around July 1995 until in or around July 1997, as a DoS employee, **ROCHA** served as Deputy Principal Officer at the United States Interests Section in Havana, Cuba.

25.   From in or around July 1997 until in or around November 1999, as a DoS employee, **ROCHA** served as Deputy Chief of Mission at the United States Embassy in Buenos Aires, Argentina.

26.   From in or around November 1999 until in or around August 2002, as a DoS employee, **ROCHA** served as Ambassador to Bolivia at the United States Embassy in La Paz, Bolivia.

### The Defendant's Conduct to Gain Access to Nonpublic Information

27.   Throughout his employment at the DoS, **ROCHA** had unique access to nonpublic United States government information.

28.   At no time was **ROCHA** authorized, directly or indirectly, to deliver, communicate, or transmit nonpublic information to agents, officers, or employees of any hostile foreign intelligence service, during or after his employment.

6

29. Throughout his DoS employment, **ROCHA** repeatedly was required, in questionnaires, security briefings, interviews, and other settings, to affirm that he understood and would adhere to laws and regulations restricting the use and sharing of nonpublic information, including classified information subject to greater restrictions.

30. For example, on November 25, 1981, **ROCHA** signed a Security Agreement in which he acknowledged he could not publish or reveal to any person, either during or after his DoS employment, any classified or administratively controlled information, or any other information transmitted to him in confidence in the course of his official duties.

31. In another example, on January 12, 1989, **ROCHA** signed a Classified Information Nondisclosure Agreement, in which he acknowledged that unauthorized disclosure of nonpublic information could cause irreparable injury to the United States or could be used to advantage a foreign nation.

32. Through his career, **ROCHA** also was required to affirm his loyalties to the United States and absence of covert activity on behalf of any foreign nation. **ROCHA** repeatedly answered these questions falsely.

33. For example, in a 1981 questionnaire, **ROCHA** falsely responded "no" to the questions "Are you now or have you ever been an agent or representative of, or otherwise employed by or acted for a foreign principal, either personally or through association with a firm?" and "Are you now or have you ever been a member of any foreign or domestic organization, association, movement, group, or combination of persons which is totalitarian, fascist, communist, or subversive?"

7

34.   On September 22, 1991, **ROCHA** falsely stated in a SF-86 Questionnaire for National Security Positions that he had not ever "been employed by or acted as a consultant for a foreign government, firm or agency."

35.   On May 8, 1994, during an FBI background investigation interview conducted at the United States Embassy in Santo Domingo, Dominican Republic, regarding his appointment to the United States National Security Council, **ROCHA** falsely stated, among other things, that he did not know of any situation, past or present, which could have a bearing on his suitability for employment with the United States government; that there was nothing in his personal life that may negatively affect his appointment to the National Security Council or that could be used against him; and that he had no foreign contact with Cuban nationals.

36.   On August 25, 1999, in a SF-86 Questionnaire for National Security Positions, **ROCHA** falsely answered "no" to the following questions, among others:  (a) "Are you now or have you ever been employed by or acted as a consultant for a foreign government, firm, or agency?"; (b) "Have you ever had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, whether inside or outside the U.S. other than on official U.S. Government business?"; (c) "Is there anything in your personal life that could be used by someone to coerce or blackmail you?; and (d) "Is there anything in your life that could cause an embarrassment to you or to the President if publicly known?"

## Summary of Activities After Leaving the State Department

37.   Since leaving DoS, **ROCHA** has held a series of lucrative private-sector jobs. **ROCHA** currently is employed by LLYC USA as a "senior international business advisor."

38.   From in or around 2006 until in or around 2012, **ROCHA** was an advisor to the Commander of the United States Southern Command, a joint command of the United States military whose area of responsibility includes Cuba.

39.   Travel records show that **ROCHA** has traveled frequently and widely outside the United States, including multiple trips to Cuba.

### The Defendant's Contacts in 2022 and 2023 with an Undercover DGI Representative

40.   Prior to November 2022, FBI received information that **ROCHA** was a covert agent of the DGI.

41.   On November 15, 2022, while in Miami, **ROCHA** responded to a WhatsApp message from an individual purporting to be a covert DGI representative, but who was, in fact, an FBI undercover employee ("UC"). The message read: "Good Afternoon ambassador, my name is Miguel and I have a message for you from your friends in Havana. It is in regards to a sensitive matter. Are you available for a telephone call?" **ROCHA** replied: "I don't understand but you can call me."

42.   Later that day, **ROCHA** participated in a recorded phone call with the UC, in which the UC informed **ROCHA** his name was "Miguel" and that he was "representing your friends in Havana." The UC further informed **ROCHA** that he was "ordered . . . to make contact with you to give you a message. I know that you have been a great friend of ours since your time in Chile."[1] The UC then explained "we have little problems in the island and in our embassy in Santo Domingo as well, but don't worry, I'm here to resolve the situation, but these are very delicate

---

[1] Independent evidence, to include travel records, confirm that **ROCHA** lived in Chile in or around 1973.

9

issues, and it would be best to talk about it in person." **ROCHA** agreed to meet the UC in person the following day in front of a church on 6th Street in the Brickell neighborhood of Miami at 10:00 am.

### The First UC Meeting:  November 16, 2022

43.    On November 16, 2022, as directed, **ROCHA** met the UC in front of the First Miami Presbyterian Church at approximately 10:00 am.  This meeting was audio and video-recorded, as were **ROCHA**'s two subsequent meetings with the UC.  All three meetings between the UC and **ROCHA** took place in Spanish and have since been translated to English.

44.    While traveling to the meeting location, **ROCHA** engaged in a Surveillance Detection Route ("SDR") consistent with DGI tradecraft.  In my training and experience, the purpose of an SDR is to determine whether the individual is being followed or observed on the way to a covert meeting.  Specifically, law enforcement observed **ROCHA** taking an indirect, longer, circuitous route to the church, rather than going there in a direct manner.  In addition, among other things, he stopped during the route at a location for several minutes so that he could observe the meeting place from a safe distance.  **ROCHA**'s use of counter-surveillance techniques is consistent with prior training in covert operations.  Indeed, he later told the UC that "they are not going to see me when I come out over here ... that's what I did today because I did a whole route ... It's what I've always been told to do."

45.    At the start of his meeting with the UC, **ROCHA** guided the UC to a "food court" at their location with "low-level employees ... who don't want to spend too much money.  So, there's no possibility for - for anyone to see me." **ROCHA** referred to this as a "measure ... out

of precaution" because "I have always … received sufficient training to know that you must be on the alert to - to provocations."

46.    When the UC told **ROCHA** he was "a covert representative here in Miami" whose mission was "to contact you, introduce myself as your new contact, and establish a new communication plan," **ROCHA** answered "Yes," and proceeded to engage in a lengthy conversation with the UC, during which **ROCHA** repeatedly described and celebrated his activity as a DGI agent.

47.    During this meeting, **ROCHA** told the UC: "I want you to tell my Compañeros that I appreciate, and I am very thankful for this alert," explaining that during his last contact with the DGI, "I was able to travel … to the capital and while there I had a long meeting … [i]n Havana." **ROCHA** added, regarding the UC's explicit reference to "Havana" during their initial conversations: "we have another name.  We never utilize Havana … I tend to say 'The Island.' … I never use C or H … [T]hat was the only thing that … I thought, if someone has betrayed and told the enemy's counterintelligence … why are they utilizing … Havana … But … Miguel is what I remembered, because I don't write anything down … I try to memorize things … for security reasons."

48.    **ROCHA** said that "since the Dirección asked me … to lead a normal life … I have - have created the legend of a right-wing person."  I know from my training and experience that a legend is an agent's artificial background or a feature of his biography used to maintain his covert status.

49.    **ROCHA** said this meeting was "my first contact - … since my - my last trip to [] Havana," which **ROCHA** stated was in "2016 or 2017," when he traveled to Havana via Panama

and "[f]rom Panama, I went to … I mean, I entered as - as a Dominican," referring to his use of his Dominican Republic passport instead of his American passport.

50.    **ROCHA** further explained that "I always told myself, 'The only thing that can put everything we have done in danger is - is … someone's betrayal, someone who may have met me, someone who may have known something at some point.'"

51.    **ROCHA** assured the UC that "my number one concern; my number one priority was the … any action on the part of Washington that would – would endanger the life of - of the leadership, or the – or the revolution itself."

52.    **ROCHA** asked the UC to send "my warmest regards to the Dirección," and after the UC promised to do so, **ROCHA** said the following:

| | |
|---|---|
| **ROCHA:** | [I]t was decades - it was decades.  I mean, decades that were deep - |
| UC: | How many years? |
| **ROCHA:** | Almost 40. |
| UC: | Wow. |
| **ROCHA:** | Uh - of a lot of danger. Uh … They must have told you something because you mentioned Chile. … That … inspired trust in me and at the same time I thought, if there's a traitor and they know that I was in Chile[.] … I have to tell you something. |
| UC: | Tell me. |
| **ROCHA:** | Uh … It gives me a lot of … pride and satisfaction to see that - that people like Miguel, who are – who are much younger, but - |
| UC: | Thank you. |
| **ROCHA:** | - who are there – |
| UC: | Thank you. |
| **ROCHA:** | - doing … This is not easy - |
| UC: | No, no, it is not easy.  No, it is a struggle – |
| **ROCHA:** | - it is not easy - |

| | |
|---|---|
| UC: | - but we are fighting. |
| **ROCHA**: | - this is not easy. Uh… uh… |
| UC: | Thank you for your friendship and help for so many years. Right? Thank you very much. |
| **ROCHA**: | Of course, no problem … This is a huge sacrifice … huge, with a lot of tension that you have to manage internally … uh … with self-discipline - … all the time. … When you have the conviction, you have self-discipline - |

53.    **ROCHA** agreed to meet the UC again on February 10, 2023, with February 17, 2023, as a backup date.  **ROCHA** also proposed a backup location if the pair could not meet in Miami.  **ROCHA** described a specific location in Santo Domingo, Dominican Republic, where "low-income people … go to the food court" so that **ROCHA** would not be identified.

54.    **ROCHA** also agreed to utilize a Colombian Pesos bill as a parole at the next meeting to ensure operational security.  I know from my training and experience that a parole is a password or recognition phrase or item used between an agent and his handler, or between intelligence officers, as a security protocol.

<u>**The Second UC Meeting:  February 17, 2023**</u>

55.    Prior to February 10, 2023, the FBI learned **ROCHA** had left the country on a business trip.  Out of an abundance of caution, the UC arrived at the agreed-upon location, but **ROCHA** did not attend.

56.    On February 17, 2023, the backup date agreed upon at the first meeting, **ROCHA** met the UC as planned at the Brickell outdoor food court where they had met previously.

57.    When traveling to the meeting, **ROCHA** used counter-surveillance techniques similar to those for the first meeting.  Additionally, upon meeting the UC, he utilized a

Colombian Pesos bill as a parole, and complimented the UC on his cover story for their meeting. **ROCHA** told the UC, regarding their meeting location: "I have my bank here ... So, it's my legend for being here."

58.   **ROCHA** assured the UC "But of course" when told the DGI wanted to confirm "that you continue to be a Compañero of ours."

59.   **ROCHA** said, regarding how he obtained his DoS employment: "I went little by little ... It was a very meticulous process ... very disciplined – but very disciplined. ... I knew exactly how to do it and obviously the Dirección accompanied me. ... they knew that I knew how to do it ... It's a long process and it wasn't easy."

60.   When asked by the UC whether "if there was an opportunity, where we can work together again," **ROCHA** replied: "No – no  ... you guys don't even have to propose that ... if I had access to something that was worthwhile, I - I would propose it [points at himself]. Uh ... and the access ... it's having access to information that's important."

61.   During their meeting, **ROCHA** celebrated his activities on behalf of the DGI and against the United States' interests, and explained why and how he continued to preserve the secrecy of those activities, stating among other things: (1) "[F]or me, what has been done, has strengthened the Revolution.  It has strengthened it immensely ... [W]e can't put - put that in danger ... I'm very zealous in regards to what we have done and with what I have to protect, and what we have done."; (2) "I have to protect what we did because what we did ... because what we did is ... the cement that has strengthened the last 40 years.  I mean, that cement is concrete. It's not [UI], it's concrete.  You know?"; (3) "I wouldn't put what we have done in danger ... because ... they would react strongly against the Revolution ... strongly because of the fact that

14

through my participation we - we did what we did."; (4) "They underestimated what we could do to them. We did more than they thought"; and (5) "the Dirección knows" what **ROCHA** did.

62.    During this meeting, **ROCHA** further said, as confirmed in the screenshot below from close-captioned video of the meeting: "What we have done ... it's enormous ... More than a grand slam."



63.    During their meeting, **ROCHA** also lamented "the blows that the enemy," meaning the United States, "has dealt to the current revolution."

64.    **ROCHA** agreed to meet the UC a third time, and made arrangements for that meeting including a backup plan, reassuring the UC that "you can ask the Dirección ... I was always there."

### The Third UC Meeting: June 23, 2023

65.    On June 23, 2023, **ROCHA** met the UC in person at the outdoor food court where they had met the previous two times. When traveling to the meeting, **ROCHA** again used an SDR.

66.    During their meeting, when told by the UC that "the Dirección wants to ensure that

you are still a Compañero of ours … Are you still with us?," **ROCHA** responded later: "I am angry. I'm pissed off … Because of the question that was asked … It's that – that … it's like questioning my manhood … It's like you want me to drop them … and show you if I still have testicles." Later, when told that with "the help that you have given us for so long … you must have a great pair of balls not to be worried," **ROCHA** replied: "I have them - I have them."

67.   **ROCHA** promised the UC that, if there were an investigation, he knew "how to handle it," and assured the UC: "I know how to defend myself … I have the intelligence … and I have the knowledge. I mean … in the course of my duties, how many times did I meet with - with them … to answer questions … I know how it works the - the system."

68.   **ROCHA** stated to the UC that "I never – never have in 40 years put a Compañero in danger. Or others, never. And there are certain rules … from this type of work that, be it us, be them, be the Russians … So then, whoever is in a mission doesn't see the other one in another. That is simply a no, because it jeopardizes everything."

69.   **ROCHA** promised the UC that "I protect – I protect everything that has been done. I have always protected it and will protect it and I know how to protect it."

70.   **ROCHA** made arrangements to meet the UC a fourth time on December 8, 2023, also selecting backup dates.

### Diplomatic Security Service Interview on December 1, 2023

71.   On December 1, 2023, two Diplomatic Security Service ("DSS") agents from the DoS conducted a consensual, voluntary interview of **ROCHA**. During the DSS interview, **ROCHA** lied repeatedly. For example, he denied ever having met someone with the UC's description, even after being shown a picture of the UC. When **ROCHA** was shown a picture

of him sitting across from the UC during one of their meetings, **ROCHA** said the UC approached him, but one time only. When told the interviewers possessed information that he met with the UC on more than one occasion, **ROCHA** stated he did not want to comment.

### Summary of Criminal Violations Supported by Probable Cause

72.     Title 18, United States Code, Section 951 makes it unlawful for a person to act within the United States as an agent of a foreign government without prior notification to the Attorney General; in relevant part, the statute defines an agent as a person who acts "subject to the direction or control" of the foreign government. Title 18, United States Code, Section 371 makes it unlawful for a person to conspire to commit an offense against the United States, including to violate Section 951.

73.     **ROCHA**, aided by unnamed conspirators within Cuba's intelligence services, agreed to act and did act as a clandestine agent of the Cuban government during at least the period of 1981 (when **ROCHA** started at DoS) through the present.

74.     The audio and video-recorded conversations summarized above in themselves establish unequivocally that **ROCHA**, in his own words, has acted for decades as a covert agent of the DGI.



ROCHA: - it was
decades - it was decades!

75. Throughout the meetings, **ROCHA** behaved as a Cuban agent. **ROCHA** consistently referred to the United States as "the enemy," and used the term "we" to describe himself and Cuba. **ROCHA** additionally praised Fidel Castro as the "Comandante," and referred to his contacts in Cuban intelligence as his "Compañeros" (comrades) and to the Cuban intelligence services as the "Dirección," tell-tale terms used by Cuban operatives.

76. **ROCHA** also made other statements during the meetings that the investigation confirmed to be true. For example, in the November 2022 meeting, **ROCHA** described the "moment that I lived through it because I was in charge, it was the knock down of the small planes … That was a time of a lot of tension, … that was the time of the … 'Brothers to the Rescue' and other similar people … who were pushing politics towards unnecessary provocations." In fact, from approximately July 1995 until July 1997, as a DoS employee, **ROCHA** served as Deputy Principal Officer at the United States Interests Section in Havana. The incident that **ROCHA** described as the "knock down of the small planes" occurred during his tenure, in February 1996, when Cuba shot down two unarmed airplanes operated by members of Brothers to the Rescue, a U.S.-based group opposed to Castro's government, and killed four men.

77. Similarly, during the November 2022 meeting, **ROCHA** admitted traveling to Cuba in "2016 or 2017" to meet with his DGI handlers in Havana, and said that, to get there, he traveled via Panama and entered Cuba "as a Dominican." Travel records confirm that in January 2017, **ROCHA** travel to Cuba exactly as he described to the UC. Specifically, on January 2, 2017, using a United States passport bearing number 530963729, **ROCHA** flew from Miami International Airport in Miami, Florida to Santo Domingo, Dominican Republic. On January 3,

18

2017, using his Dominican Republic passport instead of a U.S. passport, **ROCHA** flew from Santo Domingo to Panama City, Panama and then from Panama City to Havana, Cuba.  On January 7, 2017, using his Dominican passport, **ROCHA** flew back from Havana to Panama City, and then to Santo Domingo.  He subsequently flew back to Miami on January 8, 2017, using his United States passport bearing number 530963729.  Notably, just two months earlier, in November 2016, **ROCHA** traveled to Havana directly from Miami on his U.S. passport.  He did so again on his U.S. passport, again directly from Miami, in November 2017.  On neither of those occasions did he use a Dominican passport or travel to Havana via the Dominican Republic or Panama as he did in January 2017.

78.    Simply put, **ROCHA**'s activities with, and admissions to, the UC, corroborated by other evidence from the investigation, prove he conspired with the DGI to act, and has continued to act to this day, as an agent of a foreign government contrary to Section 951.

79.    **ROCHA** also violated Title 18, United States Code, Section 1542 while traveling to and from Cuba in January 2017, as just described.  Section 1542, in summary, makes unlawful to willfully and knowingly use a passport whose issuance was secured by reason of a false statement.

80.    At the start of his trip to Havana to meet with the DGI, as confirmed by travel records, **ROCHA** used his United States passport bearing number 530963729 to fly initially to Santo Domingo.  **ROCHA** secured that U.S. passport in 2016, based upon an application for U.S. passport dated February 24, 2016.  In that application, **ROCHA** declared under penalty of perjury that he had not "since acquiring United States citizenship/nationality …accepted or performed the duties of any office, post or employment under the government of a foreign state

19

or political subdivision thereof." For the reasons discussed above, and based upon his own words, this statement was false, since **ROCHA** has for decades served as a covert agent of the Cuban government. **ROCHA** therefore violated Section 1542 when he used the U.S. passport obtained via that false statement to (1) travel from Miami to Santo Domingo on January 2, 2017, and (2) to re-enter the United States at Miami International Airport on January 8, 2017.

## CONCLUSION

81. Based upon all of the foregoing, I respectfully submit that this affidavit establishes probable cause to believe that **ROCHA**: (1) beginning no later than November 1981 to the present, conspired to violate 18 U.S.C. § 951, in violation 18 U.S.C. § 371; (2) beginning no later than November 1981 to the present, violated 18 U.S.C. § 951; (3) on or about January 2, 2017, violated 18 U.S.C. § 1542; and (4) on or about January 8, 2017, violated 18 U.S.C. § 1542

FURTHER YOUR AFFIANT SAYETH NAUGHT.

MICHAEL HALEY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn and subscribed before me this 1st day of December 2023.

EDWIN G. TORRES
CHIEF UNITED STATES MAGISTRATE JUDGE

20